Nott, J.,
delivered the opinion of the court:
These cases affect the compensation of probably all the letter-cariers in the United States. The statute under which they arise is singularly brief and clear, and expresses in unmistakable terms the legislative intent. But the services of letter-carriers are so peculiar and ill-defined, that the application of the law to the facts is no easy task. The statute is in these words:
“ That hereafter eight hours shall constitute a day’s work for letter-carriers in cities or postal districts connected therewith, for which they shall receive the same pay as is now paid for a day’s work of a greater number of hours. If any letter-carrier is employed a greater number of hours iter day than eight, he shall be paid extra for the same in proportion to the salary now fixed by law.” (Act 24th May, 1888, 25 Stat. L., p. 157.)
So far as compensation is involved, there are four classes of carriers, receiving annual salaries of $1,000, $850, $800, $000. Act 31 Jcmuary, 1887 (24 Stat. L., p. 355). So far as services are involved, there are apparently two classes: one like the carriers in New York, and probably in all the great cities, who are occupied incessantly from morning to night without an intermission for rest or food; and one like the carriers in Salt Lake City, who have a morning and afternoon collection and delivery, which per se requires less than eight hours of service.
On the part of the claimants it is maintained (1) that all of the work which letter-carriers perform by order of their postmasters is service contemplated by the statute, (2) that in estimating the extra service an extra hour is not to be reckoned as the eighth part of a day, but that the court and the accounting officers must take into consideration the fact that under another statute they are entitled to fifteen days’ leave of absence without loss of pay (Act 27th June, 1884, 23 Stat. L., p. 60), and under the Postal Laws and Regulations to .six holidays during the year (Regulations 1887, sec. 483), and that *252 at common law they are not required to render service on Sunday, and by tbe Regulations, section 481, only for a brief period, leaving two hundred and ninety-two days in tbe year which should be taken as the divisor of their annual salary, instead of three hundred and sixty-five.
On the part of the defendants it is maintained that the only service which is to be reckoned in estimating the eight-hour day is carrier service proper; that the Regulations, section 047, provide that—
“ Carriers shall be employed in the delivery and collection of mail matter, and during the intervals between their trips may be employed in the post-office in such manner as the postmaster may direct, but not as clerks.”
And that the Revised Statutes, section 1764, provide that—
“No allowance or compensation shall be made to any officer or clerk by reason of the discharge of duties which belong to any other officer or clerk in the same or any other Department; and no allowance or compensation shall be made for any extra services whatever which any officer or clerk may be required to perform unless expressly authorized by law (§ 1704).
Hence it is argued that the statutes and regulations are to be construed together, and that the additional pay which the eight-hour act grants is to be restricted to cases where the carrier performed service authorized by law; that is to say, the service of a carrier and not of a clerk.
The Salt Lake City cases, it is believed, embrace, with a single exception, all the questions presented by the New York cases and many more besides. We will therefore deal with the facts which they bring before the court.
In the Salt Lake City post-office the force employed consisted of three clerks and nine carriers. It appears from the testimony of the postmaster himself that the three clerks were insufficient to perform the work of the office; and it appears from the evidence that the work of the carriers in delivering and collecting letters outside of the post-office building did not occupy them more than five hours a day; A third kind of work appears in the case, which has been one of the debatable grounds of the argument, viz, the work which carriers perform within the post-office building upon the mail matter which they are to deliver. Before they go out on their rounds each takes a package of unassorted letters — i. e., no further assorted than to segregate from the mass those which belong to each carrier’s *253 route — and arranges them in the order of street and number. This is called “ routing ” the letters. Where the street and number are not given in the'direction on the letter, this service also involves looking up the residence in the directory or in noting it from memory. After the carrier returns from his round he also has work to do in connection with his carrier service, such as returning letters where the party to whom they were addressed could not be found.
In the Salt Lake office the carriers, by order of the postmaster, rendered the following service during each working day:
At 7 a. m. the carriers reported for duty. For half an hour they were employed inside the post-office proper in distributing the mail, by placing it in the general-delivery boxes. For half an hour they were occupied in “routing” their own letters ; that is, in arranging them for ready distribution on their rounds. At 8 a. m. they went out on their first delivery, returning at various times, according to the quantity of mail matter to be delivered, but generally within three hours. From the time of their return until 1 p. m. they were engaged within the post-office in the distribution of the mail. From 1 to 2 they were allowed an hour for dinner. At 2 all were required to report for duty. For an hour they were again engaged in the distribution of the mail and in “routing” their own letters. At 3 they went out on their second delivery, returning ordinarily about 5 o’clock. From 5, with an interval of an hour for supper, they were again employed in the work of distributing the mail until, ordinarily, 8 o’clock or later.
Such was the ordinary day of a letter-carrier in this office. It may be analyzed by saying that he was absent from home thirteen hours; that he was allowed two hours for his meals; that he was occupied outside of the building in the work of delivering and collecting letters five hours; that he was occupied in preparing his mail matter for the route and in making reports and returns in regard to it two hours; and that he was employed in the work of distributing letters within the building for general delivery four hours. It is also to be observed that for at least an hour this work was not performed “ during the intervals between his trips” (in the words of the regulation above quoted), but was performed after his last service as a letter-carrier had ended.
*254 Tbe work wbicb letter-carriers may do during tbe intervals between tlieir trips and tbe work wbicb they may not do as clerks is wholly undefined. No regulation, order, or instruction of tbe Post-Office Department can be found wbicb would inform postmasters or enlighten tbe court as to what these services are. Tbe term clerical service strictly, means a service that involves writing. It may be that tbe regulation was intended to prohibit tbe carriers from writing reports, making up accounts, registering letters, selling stamps, issuing money orders, and that tbe manual labor of assorting a handful of letters and throwing them into tbe appropriate boxes was not intended to be forbidden. It may be that tbe regulation was in tbe nature of a police precaution against post office robberies, by keeping tbe responsibility in tbe fewest possible bands. It may be that it was intended to keep each expense of tbe post-office within its proper appropriation. But certainly tbe regulation contemplated tbe employment of carriers on other work than collecting and delivering letters, and authorized postmasters so to employ them “during tbe intervals between their trips,” and compelled carriers to render such service.
Here, then, was a post-office with three clerks and nine carriers, tbe united force of wbicb was barely able to carry on its business. Under tbe stress of circumstances tbe postmaster interpreted tbe regulation to mean that be might exact from tbe carriers additional work in tbe distribution of mail matter within tbe office, and tbe court is not prepared to say that bis interpretation was wholly and clearly wrong.
Coming now to tbe kind of work done by tbe carriers, tbe court is unqualifiedly of tbe opinion that whatever work they may be required to do, relating to tbe mail matter wbicb they distribute and collect, must be regarded as carrier service in construing and applying tbe eight-hour law. A carrier may receive tbe letters of bis own route and simply arrange them in tbe order of tbe streets and numbers; or all tbe carriers may receive all tbe letters wbicb go out by tbe carrier system, and be obliged to divide tbe mass according to tbe routes; or they may have banded to them tbe newly arrived mail pouches and be obliged to divide tbe matter wbicb is to go out from tbe matter wbicb is to remain within tbe post-office; that is, tbe carriers’ letters from tbe box and general-delivery letters. We do not say that this last arrangement is wise or judicious; but *255 simply that if carriers are thus employed by the postmaster under whom they serve it will be, in the present state of the law and regulations, carrier service.
As to the distribution of mail matter for boxes and general delivery by carriers during the intervals between their trips, the court can not say, in the silence of the Postmaster-General, whether it was or was not the clerical service prohibited by the regulation, and in this uncertainty must adopt the construction which was apparently known to the Department,, and which for the purposes of this case must be regarded as. the construction of the Department itself.
As to the last kind of service, that which was not rendered during intervals but after the carrier’s day was over, the case is not so clear. The regulation did not by any construction authorize the postmaster to exact this, and it involved the Government under the eight-hour law in an additional liability, and was in its practical effect employing one man to do another man’s work, contrary to the intent of the Revised Statutes, if section 1764 is applicable to these cases. We agree with the counsel for the defendants that the eight-hour law was not intended as a door of evasion whereby a postmaster could bring into his office additional clerks to do work for additional pay; but the question is doubtful, the necessities of the situation were great, the good faith of the postmaster is undisputed, and the equities of the case are so strongly in favor of the carriers, that we deem it only just to resolve doubts in favor of the claimants, who have no right of appeal, leaving it to the Supreme Court to correct the error, if error it be.
We now come to the manner in which this additional time must be reckoned in dollars and cents. As has before been said, the claimants insist that the year should be divided by two hundred and ninety-two days instead of three hundred and sixty five, and the value of a day of eight hours proportionately increased. From this day of augmented value it is maintained the value of the additional hours must be derived.
The principle of excluding apparent time, which the counsel for the claimants applies to days, the counsel for the defendants, though by a different process of reasoning, applies to hours. He maintains that the additional hours intended by the statute are additional to the carrier’s actual hours of service as carrier; that it is not the time during which the carrier *256 is nominally on duty wbiob is to be reckoned, nor the time when the employment proper or improper is within the post-office building, but the time when the carrier is actually engaged in delivering and collecting letters. If the services are more than eight such hours, he is entitled to ask additional pay; otherwise, not. Or, as was said on the argument, “The door of the post-office defines the service; service without is carrier service, service within is clerical survice.'” It is apparent that the principle will cut both ways. Applied to days, it will augment the value of the additional service; but as very few carriers are actually on their feet eight hours a day running about the streets, it will cut down the hours until there is no additional time left to be paid for.
The statute which attaches an annual salary to the service does not fix the amount as compensation for three hundred and fifty-nine days — i. <?., for a year less six holidays; nor as compensation for three hundred and fifty days — that is, for a year less fifteen leave-of-absence days; nor as compensation for three hundred and forty-four days — i. e., a year less the holidays and leaves of absence; nor for two hundred and ninety-two days — i. e., for a year without holidays, leave-of-absence days, or Sundays. The salary is for a year, and when it was enacted covered all service which the carrier might render or be required to render within a year.
If the suit were brought to recover an unpaid balance of salary, we are inclined to think that no question which has been raised by one side or the other would have appeared. If a claimant had held office one day and the suit was to recover one day’s pay, we believe that the damages demanded would have been for one-three hundred and sixty-fifths of the annual salary. Conversely, if the suit had been brought to recover one year’s pay, less one absent day, we doubt whether it would have entered into any mind to deduct more than one-three hundred and sixty-fifths for that day. It can not be supposed that a claimant would have said, “In crediting the Government with the value of this one day’s deduction I should credit more than one-three hundred and sixty-fifths of my year’s pay. I should take into consideration Sundays, holidays, leave-of-absence days, and credit the Government with more — with one-two hundred and ninety-seconds of my annual salary.” Neither can we believe that the counsel for the Government *257 would have asked such a computation. Time out of mind men have been employed by the year, and certainly we can-recall no case for work and service where a court has introduced such refinements into the measure of damages.
The Treasury computation of the pay of all officers and em-ployéson annual salaries is made substantially on the ordinary basis. The year is divided into four calendar quarters, which are almost exactly equal, the first and second on a leap year containing ninety-one days each, the third and fourth ninety-two. In reckoning a day’s pay the fourth part of the annual salary is divided by the number of days in that quarter. In ascertaining this, the Treasury disregards Sundays and holidays. If a man holds an office or employment two days in a year, he is credited for two days, though one of them may be a Sunday and the other a holiday.
A statute of this nature must be interpreted in conformity with the system upon which it is ingrafted. This judgment to be declared here by the court is not an isolated judgment which, when satisfied, will pass out of existence and leave no disturbing element behind it. On the contrary, it will furnish a rule of decision for the Department. Hundreds of carriers will be paid on it for years past and continue to be paid for years to come. Assuredly the judiciary must not give an interpretation to the act which will bring trouble and confusion into the Executive Departments unless its language imperatively requires it.
There is nothing in this statute indicative of the principle by which the value of the extra time shall be computed, and whatever the principle maybe, it is manifest that regular time and extra time should be estimated by one and the same rule. If the judiciary prescribes one principle and the accounting officers proceed on another, it is evident that two rates of pay will be given to the different hours of the same day. For eight hours of a day the computation will be on the basis of three hundred and sixty-five days in the year; for the additional hours on the basis of two hundred and ninety-two; and thus trouble and confusion will be brought into the account. A monthly pay roll may show that on the first day a carrier was on duty eight hours; on the second, nine hours; on the third, ten hours; on the fourth, eight hours, etc. The numbers áre added, the total is multiplied by the value, of the hours at the *258 prescribed annual salary, ascertained from tbe formulas of tbe Department. But if tbe accounting officers have to ex-mine every carrier’s time for every day in tbe month and segregate hours which belong to a year of two hundred and ninety-two days from hours which belong to a year of three hundred and sixty-five days, the statute will have brought a confusing element into the work of accounting which never could have been anticipated by the lawmaking power.
There is one consideration which seems conclusive of the question. This statute was not intended to change the usage of the Treasury nor to disturb the existing rate of pay, and avowedly does nothing more than provide that the increased pay shall be in proportion to the increased work. That is to say, it does not change the rate of compensation, nor does it provide that a carrier shall be paid for regular work at the rate of $1,000 a year and for extra work at the rate of $1,250. On the contrary, both regular work and additional work are to be paid for at the same rate, however they may be computed. Now, if the construction contended for be given to this statute, the result will be that if a carrier is absent without leave two hours on Monday he will be charged for the two hours of absence on a basis of three hundred and sixty-five days in a year, while if he works ten hours on Tuesday he will be credited with two hours excess of time on the basis of there being two hundred and ninety-two days in the year. Nothing can be more preposterous than to construe a statute which expressly proportions increased pay to increased work so that a deduction shall be debited at one rate and an addition be credited at another. Certainly if the principle advanced for crediting letter-carriers for extra time is right, the principle on which the Treasury has debited officers and employés this hundred years and more for absence is wrong.
The counsel for the defendants has suggested that while the delivery of mail matter is a service which requires the greatest possible promptitude, this eight-hour law may operate as a bounty on tardiness and unnecessary delay, and therefore should not receive an interpretation conducive to that evil effect. And the Post-Office Department has also said in its circulars of instruction that “more than a million dollars annually” is expended in this free-delivery service, and that in consequence of the eight hour law “one thousand eight hundred *259 and fifty-two additional carriers were appointed during tbe fiscal year of 1888 to enable postmasters to bring tbe hours of service witbin tbe limits of that law. ” It is undoubtedly true that tbe system of an eigbt-bour service involves great expense and is subject or may be subject to abuses. Put these are evils to be corrected by statutes and regulations; they can not be prevented by a strained construction of tbe law. Tbe intent of tbe legislative authority as declared by tbe law itself must have full effect given to it by tlie judiciary.
In tbe New York cases a single question arises which was not presented by tbe others. On week days tlie carriers were employed more than eight-hours, but on Sundays less, and tbe deficit of tbe latter nearly equals tbe excess of tbe former. Tbe Post-Office Department, by its circular February 19,1891, has directed postmasters “To determine tbe time a letter-carrier may have been required to work during any month in excess of eight hours per day, as follows:
“Ascertain tbe aggregate hours worked during the month. Multiply tbe number of days worked durin g tbe month by eight, and subtract the product thus obtained from tbe aggregate number of hours worked, and tbe remainder will be the extra time for which tbe carrier is entitled to pay at tbe following rates:

“The time necessarily consumed in tbe performance of tbe service between “Beport for duty” and “End of duty” is tbe “actual time” to be allowed, and the interim between deliveries is tbe carrier’s own time, and can not in any case be charged against tbe United States.”
Tbe carriers’ eigbt-bour law declares “ that hereafter eight hours shall constitute a day’s work,” but it allows compensation to continue in tbe form of an annual salary, and requires no deduction to be made if tbe duties of tbe day do not extend through tbe prescribed time. It also declares that “if any letter-carrier is employed a greater number of hours per day than eight be shall be paid extra for tbe same.” To sustain tbe interpretation given to tbe act by tbe Department, it will be *260 necessary to read in it by construction tbe words “ on an average” — i. e., if any letter-carrier is employed on an average a greater number of hours per day than eight, he shall be paid extra for the same. This the court is not at liberty to do. The carrier is entitled to eight hours’ work, and to his pay if work is not furnished to him. For any excess on any day he is entitled to extra pay. The only set-off that can be maintained is when he is absent from duty without leave. The Department is at liberty to keep a carrier employed eight hours every day, but not to give him a deficit of work one day and an excess another.
In the case of Action S. Post the judgment of the court is that the claimant recover of the defendants the sum of $502.12.
In the case of Franlc Gates the judgment is that the claimant recover the sum of $56.48.
In the remaining cases submitted judgment will be suspended until the further order of the court.